FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 25, 2026

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

HUBERT GILMORE, an individual,

Plaintiff,

vs.

BENTON COUNTY, a Washington political entity,

Defendant.

No. 4:25-CV-05011-MKD

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**ECF Nos. 33, 38**

On March 4, 2026, the Court held a hearing on Defendant's Motion for Summary Judgment, ECF No. 33, and Plaintiff's Motion for Partial Summary Judgment. ECF No. 79. William J. Schroeder and Anne Schroeder represented Plaintiff. Elena Bundy, Kristofer Bundy, and Reid Hay represented Defendant. The Court has reviewed the motions and the record, has heard from counsel, and is fully informed. For the reasons stated below, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Partial Summary Judgment.

ORDER - 1

**BACKGROUND**

**A.    Factual Background**

*1. Benton County Corrections Department*

The Benton County Corrections Department (the "Department") provides incarceration for all law enforcement jurisdictions within the County.  ECF No. 66 at 2 ¶ 3.  The Department has been led by Chief Robert Guerrero since August 1, 2022.  *Id.* at 2 ¶ 4.  Chief Guerrero also served as Interim Chief of the Department from January 3, 2022, to July 31, 2022.  *Id.*

*2. The County's ADA Accommodation Policy*

The County's Americans with Disabilities Act ("ADA") Accommodation Policy states, "Benton County is committed to complying with the Americans with Disabilities Act (ADA), the Americans with Disabilities Act Amendments Act (ADAAA), and applicable state laws" and lists ways in which employees can request accommodations.  ECF No. 61 at 2 ¶¶ 7-8.  "Chief Guerrero makes his reasonable accommodations decisions with input from Benton County Human Resourced ('HR')."  *Id.* at 2 ¶ 9.  The Policy also states, "Benton County has adopted a grievance procedure providing for prompt and equitable resolution of complaints alleging any action prohibited by the ADA or state law.  Benton County prohibits retaliation for making complaints or participating in an investigation."  *Id.* at 2 ¶ 10.  "The grievance procedure requires an employee to

ORDER - 2

file a complaint within 10 business days after s/he becomes aware of the alleged violations." *Id.* at 2 ¶ 11. "The grievance procedure requires that the investigation of the complaint be concluded with a written evaluation within 30 business days of the receipt of the complaint. The procedure also allows that this time period may be extended." *Id.* at 3 ¶ 12.

   *3. Timeline of Events*

   Gilmore began working as a Corrections Officer for the County on April 21, 2004. ECF No. 61 at 1 ¶ 2; ECF No. 66 at 2 ¶ 5.

   On February 25, 2022, Gilmore provided the County with a message from his APRN regarding a rotator cuff injury. ECF No. 61 at 2 ¶ 5; ECF No. 66 at 2 ¶ 6. On March 4, 2022, Gilmore submitted a Job Analysis from his physician clearing him for Light Duty. ECF No. 61 at 3 ¶ 15. On March 11, 2022, the County accommodated Gilmore by placing him on "Light Duty Master Control." *Id.* at 3 ¶ 16.

   On June 10, 2022, Gilmore submitted a Job Analysis which stated, "[c]oncerns regarding officer assignment. Should be assigned to B Control, C Control, Second Floor Rover, Third Floor Rover, or Master Control as these assignments decrease the dependence on others and reduce the chance of reinjury." ECF No. 61 at 3 ¶ 17. The County then placed Gilmore on modified duty until November 15, 2022. *Id.* at 3 ¶ 18. In November 2022, the County placed Gilmore

ORDER - 3

back on "Light Duty Master Control."  *Id.* at 3 ¶ 19.

Gilmore has "no complaints" about his accommodations of Light Duty Master Control from March 2022 to June 2022 or the modified duty that he worked from June 2022 to November 2022.  ECF No. 66 at 2-3 ¶ 7.  He also testified that "Master Control decreased the dependence on others and reduced the chance of reinjury."  *Id.* at 5 ¶ 21.

"Shortly after Eric Wyant was hired as the County's Assistant HR Manager in mid-September 2022 he instituted the 'Fitness for Duty' form which require[d] greater detail than the 'Job Analysis' form previously used by the County."  *Id.* at 3 ¶ 8.

In January 2024, Gilmore's wife asked him to take time off from work to care for her following surgery.  ECF No. 61 at 4 ¶ 20.  In January or February 2024, Gilmore submitted a request for vacation time following his wife's surgery.  *Id.*

On March 11, 2024, Gilmore provided his Fitness for Duty form and answers to the County's follow-up questions.  ECF No. 61 at 4 ¶¶ 21-22.  The Fitness for Duty form stated that Gilmore was released to modified duty effective March 11, 2024, and "Full, unrestricted duty," with an asterisk, effective March 12, 2024.  ECF No. 66 at 3 ¶ 10.  The asterisk stated, "See notes on page 3.  Modified schedule is preferred due to movement allowed.  If modified schedule

ORDER - 4

cannot be provided, Full Duty is preferred to Light Duty as lack of movement has a negative impact on healing." *Id.* at 3 ¶ 11.  The form also stated that Gilmore's progress was "[s]lower than expected," and included the following restrictions and notes:

**4. Physical Evaluation** *(please complete each field)*:

| Employee/ Patient: | | Never | Seldom 1-10% 0-1 Hour | Occasional 11-33% 1-3 hours | Frequent 34-66% 3-6 hours | Constant 67-100% Not restricted |
|---|---|---|---|---|---|---|
| Sit | | | | | | Not restricted |
| Stand/Walk | | | | | | Not restricted |
| Climb (ladder/ stairs) | | | | | | Not restricted |
| Perform work from ladder | | | | | | Not restricted |
| Twist | | | | | | Not restricted |
| Bend/Stoop | | | | | | Not restricted |
| Squat/Kneel | | | | | | Not restricted |
| Crawl | | | | | | Not restricted |
| Reach | Right, Left, Both | | | | | Not restricted |
| Work above shoulders | R,L,B | | | 11-33% for left | | |
| Keyboard | R,L,B | | | | | Not restricted |
| Wrist (flexion/extension) | R,L,B | | | | | Not restricted |
| Grasp (forceful) | R,L,B | | | | | Not restricted |
| Fine manipulation | R,L,B | | | | | Not restricted |
| Operate foot controls | R,L,B | | | | | Not restricted |
| Vibratory task: high impact | | | | | | Not restricted |
| Vibratory task: low impact | | | | | | Not restricted |

| Lifting/Pushing | Right, Left, Both | | | Never | Seldom | Occasional | Frequent | Constant |
|---|---|---|---|---|---|---|---|---|
| *Example* | | | | *50lbs* | *20lbs* | *10lbs* | *0lbs* | *0lbs* |
| Lift | R | L | B | no restrictions | | | | |
| Carry | R | L | B | no restrictions | | | | |
| Push/ Pull | R | L | B | may not push more than 10 lbs with left arm | | | | |

**5. Other Restrictions, Considerations, Instructions or Notes;**

Concerns regarding officer assignment.  Should be assigned to B Control, C Control, Second Floor Rover, Third Floor Rover and Master Control as these positions positions reduce dependence on others and reduce the chance for re-injury.  If it is not possible to allow for this modification and there needs to be a choice between Full Duty and Light Duty, Full Duty should be assigned as a lack of movement slows the healing process.

*Id.* at 3-4 ¶ 12.

Wyant, Chief Guerrero, Lt. Lacey Ammons, Gilmore, and Gilmore's union representative participated in an interactive meeting on March 20, 2024.  ECF No. 61 at 4 ¶ 23; ECF No. 66 at 4 ¶ 13  Following the interactive meeting, on March

ORDER - 5

20, 2024, "Chief Guerrero sent Gilmore a letter stating that he was considering medically separating Gilmore from his employment and that an interactive meeting ha[d] been scheduled for April 18, 2024, to discuss the issue":

> The information discussed and presented at this interactive meeting will be used in determining the most appropriate course of action in this matter. Your duty assignment in master control will continue to be accommodated until this meeting can take place.
>
> Your attendance is voluntary; however, should you choose not to attend I will move forward and make such decisions regarding your employment status based on information currently in my possession.

ECF No. 61 at 4 ¶ 24 (quoting ECF No. 34-13 at 2).  Chief Guerrero scheduled Gilmore to work on March 22, 23, 24, and 28, 2024.  *Id.* at 5 ¶ 27.  On March 23, 2024, the County sent out a mass email to all employees with information concerning their Family and Medical Leave Act ("FMLA") rights.  *Id.* at 5 ¶ 28. After which, Gilmore realized this applied to caring for his wife.  *Id.*

On April 1, 2024, Gilmore filed an ADA Complaint regarding Chief Guerrero's March 20, 2024 Letter that the County was considering medically separating Gilmore from his employment.  *Id.* at 5 ¶¶ 29-30.  The Complaint stated, "The most recent information from my health care provider indicated that my condition has improved (albeit slower than anticipated) and my health care provider requested that my duties be expanded, not restricted."  *Id.* at 5 ¶ 31.  "My health care provider requested that I either be placed in a modified duty position

ORDER - 6

(one I held previously when my condition was not as good as it is now) and would allow County to schedule me in multiple positions of 'Full, Unrestricted Duty.' These requests are placing LESS hardship on County as they allow for more possibilities and less restrictions." *Id.* at 6 ¶ 32. Gilmore stated that he could forcefully grasp with his left hand, as he had healed, and asked for modified duty like he had been on previously. *Id.* at 6 ¶¶ 33-34. Adam Morasch, in Benton County's risk management department, was appointed as the ADA coordinator to investigate Gilmore's ADA claim. *Id.* at 6 ¶ 35.

On April 8, 2024, Gilmore submitted his FMLA leave form to the County to care for his wife after surgery. *Id.* at 6 ¶ 36. The County authorized Gilmore to take FMLA leave from April 9, 2024, through mid-May 2024. *Id.* at 6 ¶ 37; ECF No. 66 at 4 ¶ 14.[1] Gilmore also applied for leave pursuant to the Washington Paid Family & Medical Leave Act ("PFMLA"), which the County learned about on April 11, 2024. ECF No. 61 at 6 ¶ 37; ECF No. 66 at 4 ¶ 15. On April 11, 2024, the County sent Gilmore a letter rescheduling this interactive meeting from April

---

[1] The Undisputed Statement of Facts regarding Plaintiff's Motion for Partial Summary Judgment lists an end date of May 14, 2024, ECF No. 61 at 6 ¶ 37, whereas the Undisputed Statement of Facts regarding Defendant's Motion for Summary Judgment lists an end date of May 16, 2024, ECF No. 66 at 4 ¶ 14.

ORDER - 7

18, 2024, to May 17, 2024, "due to [Gilmore's] FMLA leave." ECF No. 61 at 6 ¶ 38 (alteration in original). In late April or early May 2024, Gilmore requested that his FMLA be extended until June 18, 2024, to continue caring for his wife whose recovery was taking longer than expected. ECF No. 61 at 7 ¶ 42; ECF No. 66 at 5 ¶ 16.[2] The County approved the extension on May 3, 2024. ECF No. 61 at 7 ¶ 44.

On May 7, 2024, while on FMLA leave, Morasch and Gilmore met via Webex for approximately 20 minutes for Morasch to interview Gilmore regarding his ADA claim. *Id.* at 7-8 ¶ 45.

On May 10, 2024, Gilmore emailed to Chief Guerrero stating, "I have not heard back from Chief Guerrero as it pertains to the ADA Interactive Meeting scheduled. As listed in this email chain I will be out on FMLA until mid June and will need to have this rescheduled." *Id.* at 8 ¶ 48. The same day, Chief Guerrero responded via email with an attached "interactive meeting letter" stating, "This letter is to notify you that our scheduled meeting outlined in my letter dated April 11, 2024 will still be held on **Friday May 17th, 2024 at 9am.**" *Id.* at 8 ¶ 49.

---

[2] The Undisputed Statement of Facts regarding Plaintiff's Motion for Partial Summary Judgment lists a request date of May 3, 2024, ECF No. 61 at 7 ¶ 42, whereas the Undisputed Statement of Facts regarding Defendant's Motion for Summary Judgment lists a request date of April 23, 2024, ECF No. 66 at 5 ¶ 16.

ORDER - 8

Gilmore responded:

> As you are well aware I am out on FMLA caring for my wife after a surgical procedure. The FMLA has been approved.  I am requesting this meeting be put off until I am able to return to work.  I am her only caregiver and it will be difficult to leave her alone at home will try to attend this meeting.  I am requesting this meeting be postponed until I return.

*Id.* at 8 ¶ 50.  Chief Guerrero responded:

> I am aware that your FMLA extension has been approved for the care of your wife and am also aware that you participated in another meeting via Webex while on your FMLA leave.  This is why the meeting was not rescheduled and it was noted in the updated letter that HR will be sending an updated calendar invite to you with a Webex option for you to attend the meeting remotely.

*Id.* at 8-9 ¶ 51.  Gilmore responded:

> Due to the importance of this meeting, I feel strongly that this is a meeting I need to attend in person, not via Webex.
>
> By scheduling this meeting during the time that have been approved for Family Medical Leave, I believe my rights as an employee on FMLA are being violated.
>
> I respectfully request that this meeting be rescheduled for a time after June 18, 2024, when my leave ends, so I can attend this meeting in person.

*Id.* at 9 ¶ 52.  On May 13, 2024, Chief Guerrero wrote:

> As a reminder this meeting was originally scheduled for April 18, 2024 and then rescheduled to May 17, 2024 to accommodate your initial FMLA leave.  As noted in each of your letters that your attendance is voluntary and understanding that you are caring for your wife the Webex

ORDER - 9

> option will be provided for you to participate in this meeting.  As I mentioned in my previous email, you attended another meeting for another county department via Webex and this option is again being offered to you to be able to participate in this meeting.

*Id.* at 8-9 ¶ 53.  The same day, Gilmore wrote:

> I am having a hard time understanding why you are rushing this meeting when you know the situation I am in. I am also having a difficult time understanding Teamsters and HR having no input here.
>
> You know I live on a mountain with questionable internet. As this meeting can have a huge impact on the terms of my employment up to an [sic] including "separation of employment" I believe I is to important for me not to be there in person.
>
> I am not refusing to attend.  I just find it unreasonable to rush this.

*Id.* at 9 ¶ 54.  Wyant subsequently responded to Gilmore:

> HR has not provided input to this point as you haven't requested input from us, and I was taken off your last email until I was added back on by the Chief.  I have also taken Heather and Adam off this email chain as their respective positions are not involved in the scheduling of this meeting.
>
> As it relates to the rescheduling of your meeting, it is the opinion of HR that keeping the meeting as scheduled is not unreasonable.  The Chief offered a Webex option which is one that you utilized while working with the Risk Manager on your ADA complaint.  Additionally, as you will recall, you were sent notice of the initial meeting being scheduled on April 18, 2024 on March 20, 2024 which was before you requested FMLA leave.  The FMLA provides job protections so that your need for leave is not something

ORDER - 10

> that your employer can discriminate against you for. As this process and the initial scheduling of the meeting pre-date your FMLA request, this meeting is separate and apart from you need for FMLA leave.

*Id.* at 9-10 ¶ 55. Gilmore responded to Wyant:

> With the weight and impact this meeting is having on my well being, BCCD understanding my situation, and the history here, I believe it to be unreasonable to rush this meeting. I also believe in transparancy so I took the liberty of adding the individuals you removed from this thread. The input of all involved is always requested.

*Id.* at 10 ¶ 56 (as written in original). On May 16, 2024, Wyant emailed Gilmore to see if he would be attending the interactive meeting on May 17, 2024. *Id.* at 10 ¶ 57. Prior to the interactive meeting, Gilmore retained counsel, who sent a letter to the County asserting that holding the interactive meeting while Gilmore was on leave was "improper." *Id.* at 10 ¶¶ 58-59. On May 17, 2024, the County held the interactive meeting without Gilmore. *Id.* at 11 ¶ 65. The County subsequently medically separated Gilmore while he was on authorized FMLA leave. *Id.* at 11 ¶ 66. At the March 20, 2024, interactive meeting, Gilmore had advised Chief Guerrero and Wyant that he was scheduled to see Dr. Gibbons in June 2024 concerning the status of his recovery from his torn rotator cuff. *Id.* at 11 ¶ 67.

On June 10, 2024, the County emailed Gilmore a link to open positions within the County. ECF No. 66 at 5 ¶ 17.

On June 12, 2024, Gilmore's doctor cleared him for unrestricted duty and

ORDER - 11

Gilmore emailed this Fitness for Duty form to the County.  *Id.* at 11 ¶ 68; *see also* ECF No. 66 at 5 ¶ 19 (noting the Fitness for Duty form dated June 12, 2024, contained no restrictions).  On June 18, 2024, the date Gilmore was authorized to return from FMLA leave, he no longer had a job with the County.  ECF No. 61 at 11 ¶ 69.  Days after June 12, 2024, Gilmore submitted an application for employment with Franklin County for the position of Lateral Corrections Officer ("CO") and began working for Franklin County in October 2024.  ECF No. 66 at 5 ¶ 20.  In total, Gilmore was unemployed for approximately 6 months.  ECF No. 61 at 11 ¶ 69.

   **B.    Procedural History**

   Gilmore filed the operative Complaint on December 27, 2024, in Yakima County Superior Court, which alleges the following causes of action: (1) disability and race discriminating under the Washington Law Against Discrimination ("WLAD"); (2) violations of the PFMLA; (3) violations of the FMLA; and (4) violations of the ADA.  ECF No. 101 at 5-8.  The Court previously granted the County's motion for partial judgment on the pleadings regarding the cause of action of racial discrimination under the WLAD.  ECF No. 18.

   The parties filed cross motions for summary judgment.  ECF Nos. 33, 38.  The Court heard oral argument on the motions and allowed the parties to submit additional briefing, ECF No. 81. *See* ECF Nos. 82-90.

ORDER - 12

**LEGAL STANDARD**

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (citation omitted). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the portions of the record and the evidence that demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. After the moving party has satisfied its burden, to survive summary judgment, the non-moving party must demonstrate with evidence on the record, "specific facts" showing that there is a genuine dispute of material fact for trial. *Id.* at 324. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's

ORDER - 13

favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255.

**DISCUSSION**

The County seeks summary judgment on the remaining claims. ECF No. 33 at 3. Gilmore seeks partial summary judgment as to the FMLA and PFMLA claims.

**A. ADA and WLAD**

Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees." 42 U.S.C. § 12112(A). "[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).

To establish a prima facie case for disability discrimination under the ADA, a plaintiff must establish "(1) that []he was disabled under the ADA; (2) that []he was a qualified individual with a disability; and (3) that []he was discriminated

ORDER - 14

against by h[is] employer because of that disability." *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 798-99 (9th Cir. 2017) (citing *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013)).  "A qualified individual with a disability is defined as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . ." *Id.* (quoting *Smith*, 727 F.3d at 955).

"To withstand a motion for summary judgment on an ADA claim, a plaintiff must either provide sufficient direct evidence of an employer's discriminatory intent, or give rise to an inference of discrimination by satisfying the burden-shifting test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Mickealson v. Cummins, Inc.*, 792 F. App'x 438, 440 (9th Cir. 2019) (citation omitted).

Washington courts look to federal case law to "guide [their] interpretation of the WLAD." *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 197 (Wash. 2014) (footnote omitted).  Thus, this same framework governs Gilmore's WLAD claim. *See Kees v. Wallenstein*, 973 F. Supp. 1191, 1193 n.2 (W.D. Wash. 1997), *aff'd,* 161 F.3d 13 (9th Cir. 1998), and *aff'd,* 161 F.3d 1196 (9th Cir. 1998).

The County asserts that Gilmore's ADA and WLAD claims fail for the following reasons: (1) "although Mr. Gilmore was unable to perform the essential function of physical defense of the [Corrections Officer] position with or without

ORDER - 15

accommodation, the County nonetheless accommodated him by placing him in a light duty assignment where he was not exposed to the inmate population for 648 days"; (2) "the evidence shows that the County medically separated Plaintiff for a legitimate, non-discriminatory reason"; (3) the County acted in good faith; (4) "Mr. Gilmore had a duty to participate in the interactive process in good faith."  ECF No. 33 at 17-21.

Gilmore, in turn, asserts that he has met each of the elements necessary to establish a prima facie case for disability discrimination under the ADA or the WLAD, or that questions of material fact exist for a jury to determine.  ECF No. 52 at 4.

### 1. Disability

The parties do not dispute that Gilmore was disabled under the ADA or WLAD.  *See* ECF No. 33; ECF No. 52 at 4.  Thus, Gilmore has established this element of the ADA and the WLAD for the purpose of summary judgment.

### 2. Qualified Individual

The parties dispute whether Gilmore was a qualified individual who could perform the essential functions of the position that he held or desired.  ECF No. 33 at 19; ECF No. 52 at 4-8.

"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires.  The term

ORDER - 16

'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "A highly fact-specific inquiry is necessary to determine what a particular job's essential functions are." *Cripe v. City of San Jose*, 261 F.3d 877, 888 n.12 (9th Cir. 2001) (citations omitted).

> Evidence of whether a particular function is essential includes, but is not limited to:
> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

The County asserts that Gilmore was "was unable to perform the essential function of physical defense of the [Corrections Officer] position with or without accommodation," ECF No. 33 at 19, and that this case is in line with *Kees v. Wallenstein*, 161 F.3d 1196 (9th Cir. 1998), ECF No. 62 at 6.

In *Kees*, former King County Jail corrections officers appealed the district court's grant of summary judgment, which found "that plaintiffs are not qualified individuals under the ADA because their inability to have direct inmate contact

ORDER - 17

prevent[ed] them from performing the essential functions of the corrections officer job." *Id.* at 1197.  The Ninth Circuit stated:

> We agree with the district court that appellants are not qualified individuals with disabilities under the ADA. No accommodation would allow them to have direct inmate contact, an essential function of the corrections officer position. *See Kennedy,* 90 F.3d at 1481 (citing 42 U.S.C. § 12111(8)).
>
> We have carefully considered each factor listed in 29 C.F.R. § 1630.2(n)(3)(1997) for determining whether a particular job function is essential.  The record indicates that both the employer and the written job description identify inmate contact as a fundamental duty.  Although corrections officers assigned to the control room are not expected to have inmate contact on a regular basis, plaintiffs acknowledged that some incidental contact is inevitable.  Further, their ability to restrain inmates during an emergency is critical to jail security.  In fact, several corrections officers testified that jail safety is currently jeopardized by appellants' inability to respond to emergencies.  Finally, the relevant collective bargaining agreement indicates that King County corrections officers are expected to rotate among several positions, most of which require inmate contact.

*Id.* at 1199.

Gilmore, in turn, asserts that this case is similar to *Cripe v. City of San Jose*, 261 F.3d 877 (9th Cir. 2001).  ECF No. 52 at 5.  There, the plaintiffs—six police officers who had suffered injuries while on the force—challenged the San Jose Police Department's policy of preventing such officers from obtaining "specialized assignments," instead relegating such officers to "modified-duty assignments,"

ORDER - 18

which were "highly undesirable." *Id.* at 882. The district court granted summary judgment to the city on the basis that the plaintiffs were not "qualified individuals" because they could not have performed the essential function of "effect[ing] a forcible arrest, control[ling] a combative or escaping individual and respond immediately to physical threat or widespread emergency crisis." *Id.* at 884. "The district court agreed with the city that the performance of these duties is an essential function of all specialized assignments, even though specialized assignments are not patrol-officer positions." *Id.* On appeal, the Ninth Circuit found, based on the evidence before it, including the deposition of a sergeant in the fraud unit, who testified based on his first-hand experience, "that being able to serve arrest warrants and make arrests is not, for all practical purposes, part of being a fraud investigator" and that there were other positions, such as investigative positions, such officers could fill, there was "a factual dispute as to whether the ability to make a forcible arrest is an essential function of *all* the specialized-assignment positions that the plaintiffs seek the opportunity to fill, notwithstanding the job descriptions that the Department has prepared." *Id.* at 887, 889.

First, the record before the Court "indicates that both the employer and the written job description identify inmate contact as a fundamental duty." *See Kees*, 161 F.3d 1199. Chief Guerrero asserts that "[u]se of force is an essential function

ORDER - 19

of the Corrections Officer position at Benton County Corrections."  ECF No. 63 at 2 ¶ 4.  Likewise, the County's Classification Description for a Corrections Officer, updated in June 2013, states that Corrections Officers "[a]ssure[] the fair and reasonable treatment of inmates and the maintenance and operation of a safe, secure and sanitary corrections facility, placing a primary concern for the health, welfare, safety, and security of inmates, staff, and visitors" and that "[p]hysical hazard is present from potentially hostile inmates."  ECF No. 34-2 at 1-2.  The Description also requires Corrections Officers to have the "[a]bility to physically handle and control prisoner resisting detention" and the "[a]bility to hold self in readiness at all times to effectively respond to abnormal jail conditions and situations."  *Id.* at 2-3; *see also* ECF No. 34-1 (January 2023 Benton County Classification Description).  The Benton County Corrections Department Use of Force – Corrections Officers, Policy 512 further states, "The use of force is a matter of critical concern, both to the public and to the public safety community.  Corrections officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties."  ECF No. 63-1 at 2.

Second, as explained by Chief Guerrero:

> There is only one assignment in the jail where a Corrections Officer is protected from the possible need to use force.  That place is Master Control-Light Duty. Master Control is a self-contained location, meaning that

ORDER - 20

entering, exiting and being in Master Control does not expose a Corrections Officer to inmates in general (if, however, an officer who is not on light duty is assigned to Master Control, that officer may encounter inmates returning to/from work release and/or if the officer exits into the jail; while Master Control for light duty Corrections Officers is designed so that injured officers aren't required to encounter inmates).  Master Control has its own restroom, as well as a microwave and small refrigerator so that a Corrections Officer on light duty can perform all of his work - and if he chooses, is able to take all of his breaks within Master Control.

ECF No. 63 at 3-4 ¶ 6.

Gilmore acknowledges that "Master Control and Master Control-Light Duty are two separate positions.  The Master Control Light-Duty is isolated in Master Control.  The Correction Officer cannot go into the facility.  Regular Master Control allows the Correction Officer to enter the facility of the jail and assist in pat searches, and security rounds in work release areas."  ECF No. 51 at 12 ¶ 11(B) (citing ECF No. 53 at 8).  However, he asserts that "[t]here are approximately thirteen jail assignments within the Jail that Corrections Officers may be assigned to for a shift.  Not every assignment has the Corrections Officer exposed to inmates in close quarters."  ECF No. 54 at 6 ¶ 23; *see also* ECF No. 54 at 41-42 (Exhibit D).  Specifically, Gilmore asserts that "[a]s of May 21, 2024, when [he] was medically separated, [he] was capable of performing all the essential functions of Master Control, B Control Rover, C Control Rover, Second Floor Rover, and Third Floor Rover[,]" as such positions did not involve "expos[ure]to inmates in close

ORDER - 21

quarters." ECF No. 54 at 6-7 ¶¶ 23, 28.

While Gilmore asserts that he would not have been "exposed to inmates in close quarters" in such positions, Chief Guerrero asserts, "Corrections Officers in all assignments other than light duty (Master Control), are required to be prepared to respond to a wide range of emergencies which include: Medical assistance, Officer assistance calls for uncooperative inmates, inmate assaults on staff or other inmates, inmates armed with weapons, and escape attempts." ECF No. 63 at 6 ¶ 10. Further, "both B Control and C Control require a Corrections Officer to walk through the jail when entering, exiting, and taking breaks, which means they are exposed to inmates and the possibility of a situation where use of force may be needed to protect the Corrections Officer, his co-workers, and inmates" and when assigned as a Second or Third Floor Rover, Corrections Officers "have regular inmate contact with inmates leaving the housing units, going to court, going to medical or moving housing units." ECF No. 63 at 5, 7-8 ¶¶ 8, 12.

In particular, the County has provided a report of a September 8, 2018, incident involving strikes between Gilmore and an inmate while Gilmore was conducting a cell sanitation and search in C Pod. ECF No. 63-3; *see also* ECF No. 63-4 (video of incident). During that incident, Gilmore was assisted by two officers working as Second Floor Rovers. ECF No. 63-3 at 6, 8. Gilmore does not deny these facts, but argues that the Second Floor Rovers who responded were

ORDER - 22

"able to assess the situation and respond" and that "[t]his is very different from having a spontaneous attack. I feel very comfortable responding to situations as I am able to quickly assess and intervene in a way that keeps everyone safe." ECF No. 85 at 3 ¶ 10. Gilmore also asserts that West Wing Rover was not a position listed on his modified duty, as he "could have been in danger during spontaneous uses of force in confined areas." *Id.* at 4 ¶ 11.

The County has also provided a review of a February 10, 2022, incident in which Gilmore was called to respond to an inmate attack of an officer in Booking. *See* ECF No. 63-2 (Response to Resistance Review). Again, Gilmore does not dispute the facts of this event but asserts that Booking was not one of the positions listed as modified duty in his Fitness for Duty forms and that "[d]uring this incident, I was already in pain from my rotator cuff syndrome. Although since I had not gotten my MRI, I had not yet been diagnosed with rotator cuff syndrome. I believe the February 10, 2022, report reflects that even when I was in pain, I could effectively respond to situations and keep myself, fellow officers, and inmates safe." ECF No. 85 at 2 ¶¶ 4-5.

In sum, the parties do not dispute that Corrections Officers, including those in Master Control, B Control Rover, C Control Rover, Second Floor Rover, and Third Floor Rover, are required to respond to emergencies that could involve the use of force. *See* ECF No. 54 at 41-42; ECF No. 84 at 3 ("Gilmore was capable of

ORDER - 23

performing the duties of the modified (alternate) schedule (B Control, C Control, 2nd Floor Rover, 3rd Floor Rover and/or Master Control), and he knew that in the assignments (positions) listed in that modified schedule would require interaction with inmates or be involved in uses of force. . . . Gilmore was able to handle himself physically in those assignments (positions) and was fully aware that he would have contact with inmates and could be involved in uses of force. . . .”). Rather, Gilmore merely alleges that he would “feel very comfortable responding to situations” as Second Floor Rover and that the fact he could respond to an incident before his diagnosis of rotator cuff syndrome establishes that he “could effectively respond to situations and keep myself, fellow officers, and inmates safe.” Gilmore’s feeling that he could have responded as a Second Floor Rover does not establish that he was physically capable of doing so nor does the fact that he was able to respond to an incident *before* his diagnosis.

Gilmore also asserts that “between June 2022 and November 2022, [he] worked a modified schedule with no issues.” ECF No. 52 at 7. This modified schedule including “perform[ing] the duties of Master Control, B Control Rover, C Control Rover, Second Floor Rover, and Third Floor Rover.” ECF No. 54 at 7 ¶ 29.

Although Gilmore performed these positions “without any incident or injury to [him]self or others,” *id.*, the County has identified thirty force response incidents

ORDER - 24

in the facility during this time frame, of which, "there were 5 incidents on the 2nd floor- which the 2nd Floor Rover would have to respond, 3 incidents on the 3rd floor which the 3rd Floor Rover would have responded to, and 3 incidents on the west wing where, if Mr. Gilmore was out of B and C Control, he would have responded to."  ECF No. 63 at 6-7 ¶ 11.

Further, while the County allowed Gilmore to temporarily work alternative assignments other than Master Control-Light Duty, the County has offered evidence that it placed Gilmore on Master Control Light Duty from early March 2022 to mid-June 2022 based on the Job Analysis forms completed by Gilmore's heath care providers on March 4, 2022, and March 21, 2022.  ECF No. 87 at 3; ECF No. 87-1.  The County later "accommodated Mr. Gilmore in the alternate assignment of B-Control, C-Control, 2nd Floor Rover, 3rd Floor Rover or Master Control from approximately mid-June 2022 through approximately mid-November 2022" based on subsequent Job Analysis forms.  ECF No. 87 at 4.  Gilmore's May 20, 2022 Job Analysis form stated he "may return to full-duty without restrictions 6/4/22 with concerns regarding officer assignment."  ECF No. 87-2 at 1.  His next Job Analysis form on June 20, 2022, clarified "[c]oncerns regarding officer assignment" and stated Gilmore "[s]hould be assigned to B Control, C Control, Second Floor Rover, Third Floor Rover or Master Control as these assignments decrease the dependence on others and reduce the chance for re-injury."  *Id.* at 2;

ORDER - 25

*see also id.* at 3 (September 16, 2022, Job Analysis form stating the same); *id.* at 4 (October 31, 2022, Job Analysis form stating the same).  According to Chief Guerrero, it was after the County implemented its more detailed Fitness for Duty form, that he gained additional detail regarding Gilmore's condition from the November 14, 2022 Fitness for Duty form and "made the decision to move him from where he was working at the time (3rd Floor Rover) to Master Control, based upon the limitations identified by his healthcare provider and concern for Mr. Gilmore's safety, the safety of his colleagues, and the safety of the inmates he was entrusted to protect."  ECF No. 87 at 4 ¶ 9; *see also* ECF No. 34-3 at 2 (noting Gilmore could reach "[o]cassion w/ left"; "work above shoulders . . . never for L"; "grasp (forceful) . . . never for L"; "Vibratory task . . . never for L"; and "may not lift more than 5 lbs with left arm"; "may not carry more than 5 lbs with left arm"; and "may not exert more than 5 lbs of pressure either pushing or pulling with left arm").

Deposition testimony from Gilmore's healthcare providers explains that they recommended Gilmore be assigned to B Control, C Control, Second Floor Rover, Third Floor Rover or Master Control based on their understanding that he would not be involved in physical altercations in these positions.  *See* ECF No. 83-1 at 9 (Declaration of Timothy R. Nickolaus, PA: "**Q.  Oh, I see. So the B and C Control, for example, was it your understanding that, I know you don't**

ORDER - 26

understand the specifics of that assignment, but was it your understanding that didn't involve inmate contact such as a physical altercation?** A.  Correct. And based on what the patient told me, that was my understanding, is that that would not be something that he would have to encounter in those – in those assignments."); ECF No. 83-2 at 5  (Declaration of David Gibbons, MD: "**Q.  Did you have any understanding, based on anything that Mr. [Nickolaus] told you, about those assignments?** A.  What I knew, and we continue, was just to -- with the state of his shoulder at the time, we had -- we had discussed as a team that we did not want him having inmate contact.  And so, therefore, going with what Mr. Nicholas had said previously, on the previous office visits, we said no inpatient -- or sorry – no inmate contact.  Let's continue with the current position.  **Q.  Got it. So as of November 14th of 2022, it was your recommendation that Mr. Gilmore continue in these alternative assignments that are listed in this medical record, based on the understanding that there was no inmate contact in those alternative assignments?** A.  Correct.").

Gilmore's March 11, 2024 Fitness for Duty form—the last one the County received before medically separating Gilmore—continued to list restrictions to his left arm including work above shoulders being limited to occasional and noting that Gilmore "may not push more than 10 lbs with left arm."  ECF No. 34-12 at 3. And Gilmore himself stated during the March 20, 2024 interactive meeting that

ORDER - 27

these restrictions stood whether he was working Master Control-Light Duty or another modified schedule and expressed concerns about his ability to defend himself:

> The concern being my ability to push off . . . and defense of myself. I am a striker when it comes to defending myself. I'm not a grappler. Most of those inmates -- and this is how I discussed it with my orthopedic -- most inmates in the facility wrestle. It's a wrestling area. I'm skilled at it, but right now, being in a confined space and pushing off, I'm probably better than most, but not comfortable.

ECF No. 35-3 at 2.

In sum, the evidence before the Court establishes that the use of force is an essential function of a Corrections Officer based on the County's written job descriptions and the judgment of the County's Chief, and that Corrections Officers must be able to respond to emergencies. Gilmore has raised no genuine issue of fact to the contrary. Gilmore attempts to analogize his situation to that in *Cripe* in which there were positions other than that of a patrol-officer, which officers could fill. While Gilmore asserts that the positions of Master Control, B Control Rover, C Control Rover, Second Floor Rover, and Third Floor Rover "allowed [him] to control the situation," there is no genuine dispute that these are all Corrections Officer positions, which may require inmate contact and that Gilmore's medical providers only recommended such positions based on the understanding that they did not involve such contact. *See* ECF No. 83-1 at 9; ECF No. 83-2 at 5. Thus,

ORDER - 28

viewing the facts in the light most favorable to the nonmoving party, the Court finds that Gilmore was not a qualified individual who could perform the essential functions of a Corrections Officer.

*3. Discrimination*

The parties dispute whether the County discriminated against Gilmore. ECF No. 33 at 20; ECF No. 52 at 16-17.

Under the ADA, "an employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'" *US Airways, Inc. v. Barnett*, 535 U.S. 391, 395 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)). To defeat a defendant employer's motion for summary judgment, a plaintiff employee "need only show that an 'accommodation' seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *Id.* at 401-02 (citations omitted). Alternatively, an employee may "show that special circumstances warrant a finding that . . . the requested 'accommodation' is 'reasonable' on the particular facts." *Id.* at 405. "Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* at 402 (citations omitted).

ORDER - 29

Gilmore requested that he be placed in the position of a Corrections Officer in B Control, C Control, Second Floor Rover, Third Floor Rover, or Master Control. As detailed above, it was not reasonable for the County to place Gilmore in such positions, which involved inmate contact, with his physical restrictions.

While the County could, and did, place Gilmore in Master Control-Light Duty from March 2022 to June 2022 and again from November 2022 until his medical separation, based on the information provided to the County by Gilmore on March 11, 2024, Gilmore was still experiencing physical limitations and his recovery was progressing "[s]lower than expected." ECF No. 66 at 3-4 ¶ 12. Continuing to accommodate Gilmore in Master Control – Light Duty with no indication of when he would be able to perform the essential functions of a Corrections Officer was not reasonable particularly given the limited number of positions in Master Control – Light Duty. *See Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016) ("Plaintiff's request for an indefinite extension of light-duty status was unreasonable as a matter of law."); *see also* ECF No. 34 at 3 ¶ 8 (Declaration of Chief Guerrero: "Master Control is not a permanent position; it is an assignment that is intended to be available for individuals who are injured and in need of light-duty that does not expose them to the inmate population. There are only six assignments in Master Control and the pool of individuals for whom the assignment is reserved consists of approximately 93 individuals amongst five

ORDER - 30

squads."); *id.* at 6 ¶ 23 (Declaration of Chief Guerrero: "During the time period of March 2022-June 2024, Mr. Gilmore was on light duty for 648 days – longer than any other Corrections employee during that time period.  The employee who spent the most time assigned to light duty during that time period (after Mr. Gilmore), was on light duty for 353 days.  At one point during Mr. Gilmore's accommodation in Master Control, all 6 assignments were filled by injured employees, leaving no room for others needing light duty to recover from injuries or conditions.").

In sum, viewing the facts in the light most favorable to the nonmoving party, there is no genuine dispute of fact that the only position in which the County could accommodate Gilmore was Master Control – Light Duty, a position which Gilmore held for 648 days with continuing physical limitations, and that the County could not reasonably accommodate Gilmore in Master Control – Light Duty indefinitely.

### 4.  Good Faith

The parties each assert that the other did not act in good faith.  ECF No. 33 at 17-18; ECF No. 52 at 9-15.

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations that will enable the employee to perform her job duties." *Dunlap*

ORDER - 31

*v. Liberty Nat. Prods., Inc.*, 878 F.3d 794 (9th Cir. 2017) (citing *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001)).  "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process."  *Humphrey*, 239 F.3d at 1137 (citations omitted).  "Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible."  *Id.* (citation omitted).  Further, "an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process."  *Snapp v. United Transportation Union*, 889 F.3d 1088, 1096 (9th Cir. 2018) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000), *vacated sub nom. US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)).

The Ninth Circuit has also emphasized that:

> [T]he duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.'"  *McAlindin,* 192 F.3d at 1237.  The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "[i]f a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship."  EEOC Enforcement Guidance on Reasonable Accommodation, at 7625.  Thus, the employer's obligation to engage in the

ORDER - 32

interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work, and by avoiding the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective.

*Id.*

There is no genuine dispute that the County engaged in the interactive process in good faith. The County continuously accommodated Gilmore from March 2022 to June 2024, with 648 days in Master Control – Light Duty. While Gilmore asserts that the County "did not consider Gilmore's requests" and "provided no alternative options" to Master Control – Light Duty, ECF No. 52 at 11, an employer is not obligated "to offer the precise accommodation which [the plaintiff] requests." *Doe v. Boeing Co.,* 20, 846 P.2d 531, 537 (Wash. 1993). And, as detailed above, the positions requested by Gilmore involved inmate contact, which he could not safely perform. Further, the County held an interactive meeting before medically separating Gilmore. While Gilmore asserts that the County should have rescheduled the meeting after his FMLA leave, ECF No. 52 at 11-12, it is undisputed that the County provided Gilmore with an opportunity to attend virtually, which he had recently done for another ADA meeting, or

ORDER - 33

otherwise provide additional information that the County could use to make its decision.  Gilmore did neither.

In sum, the Courts finds that viewing the facts in the light most favorable to the nonmoving party, that there is no genuine dispute that the County engaged in the interactive process in good faith.  Accordingly, the Court grants summary judgment to the County on the ADA and WLAD claims.

**B. FMLA and PFMLA**

Both the County and Gilmore move for summary judgment on the FMLA and PFMLA interference claims.[3]

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "When a party alleges a violation of § 2615(a)(1), it is known as an 'interference' or 'entitlement' claim."  *Sanders v. City of Newport*, 657 F.3d 772, 777-78 (9th Cir. 2011) (quoting *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001)).

"To establish a prima facie case of FMLA interference, an employee must

---

[3] The County's response contends that Gilmore has failed to establish an FMLA retaliation claim.  ECF No. 46 at 19.  Gilmore confirms he is not bringing a retaliation claim, ECF No. 59 at 2, so the Court does not address this argument.

ORDER - 34

show (1) [he] was eligible for the FMLA's protections, (2) [his] employer was covered by the FMLA, (3) [he] was entitled to FMLA leave, (4) [he] provided sufficient notice of [his] intent to take FMLA leave, and (5) [his] employer denied [him] FMLA benefits to which [he] was entitled." *Allstot v. Confluence Health*, 2018 WL 3966255 (E.D. Wash. Aug. 17, 2018) (citing *Sanders*, 657 F.3d at 778). "An employer violates the FMLA's anti-interference provision if it 'use[s] the taking of FMLA leave as a negative factor in employment actions.'" *Id.* (quoting *Bachelder*, 259 F.3d at 1122-24). The Ninth Circuit has "declined to apply the type of burden shifting framework recognized in *McDonnell Douglas* to FMLA 'interference' claims; rather, an employee can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Sanders*, 657 F.3d at 778 (citations, quotation marks, and alteration omitted).

"The [PFMLA] mirrors the federal framework. [PFMLA] leave must be taken concurrently with leave under the FMLA. Like the FMLA, the [PFMLA] provides 12 weeks of unpaid leave for certain medical reasons, birth or placement of a child, and care of family members with a serious health condition. Leave can be used intermittently or to reduce the employee's schedule." *Bultena v. Washington State Dep't of Agric.*, 319 F. Supp. 3d 1215, 1224 (E.D. Wash. 2018).

Gilmore asserts the County interfered with his FMLA rights by: (1)

ORDER - 35

scheduling an interactive meeting during Gilmore's authorized FMLA leave over his objections, (2) asserting that Gilmore demonstrated the ability to use Webex is an inducement for Gilmore to waive his FMLA rights, and (3) using Gilmore's exercise of his FMLA rights as a negative factor in the County's decision to medically separate him from his employment. ECF No. 38 at 9-13; *see also* ECF No. 59 at 10. The County asserts that these claims fail because "the County terminated Mr. Gilmore for a legitimate, non-discriminatory reason." ECF No. 33 at 21.

### 1. Eligibility and Notice

The parties do not dispute that Gilmore has established the first four elements of an FMLA/ PFMLA claim. ECF No. 38 at 9. ECF No. 38 at 9; ECF No. 46 at 13 ("While Plaintiff contends he's established a prima facie case of FMLA interference, he cannot establish prong 5 because the County separated his employment for a legitimate reason unrelated to his leave . . . .").

### 2. Denial of Benefits – Interactive Meeting

The parties dispute whether holding an interactive meeting while Gilmore was on FMLA leave constitutes a denial of FMLA benefits. ECF No. 38 at 9; ECF No. 46 at 9.

Gilmore asserts that "Benton County denied and interfered with Gilmore's FMLA rights by scheduling an interactive meeting during Gilmore's FMLA leave

ORDER - 36

over his objections." ECF No. 38 at 10. The County, in turn, asserts that "an employer can require an employee to engage in *di minimus* tasks while on leave and provide status updates" and that the interactive meeting was such a *di minimus* task. ECF No. 46 at 4, 9.

"Employers are allowed to engage in de minimis contacts with employees on FMLA leave." *Jones v. Washington Dep't of Emp. Sec.*, 2025 WL 3158093, at *4 (W.D. Wash. Nov. 12, 2025) (citations omitted). Gilmore relies on the Merriam-Webster definition of *de minimis* as "lacking significance or importance: so minor as to merit disregard." ECF No. 59 at 6. He asserts that the meeting was not de minimis, as "[i]t was neither minor nor insignificant" nor was it for a status update, but rather the meeting was to determine whether Gilmore would be medically separated from his employment. *Id*. While this meeting was important to Gilmore, this does not establish that the County asking Gilmore to attend an interactive meeting regarding his accommodation during unrelated FMLA leave interfered with his leave. Rather, it is undisputed that Chief Guerrero informed Gilmore that his attendance was voluntary and provided a Webex option for Gilmore to participate in the meeting. *See* ECF No. 34-16 at 4 ("I am aware that your FMLA extension has been approved for the care of your wife and am also aware that you participated in another meeting via Webex while on your FMLA leave. This is why the meeting was not rescheduled and it was noted in the updated letter that HR will

ORDER - 37

be sending an updated calendar invite to you with a Webex option for you to attend the meeting remotely."); ECF No. 34-16 at 3 ("As a reminder this meeting was originally scheduled for April 18, 2024 and then rescheduled to May 17, 2024 to accommodate your initial FMLA leave. As noted in each of your letters that your attendance is voluntary and understanding that you are caring for your wife the Webex option will be provided for you to participate in this meeting.  As I mentioned in my previous email, you attended another meeting for another county department via Webex and this option is again being offered to you to be able to participate in this meeting.").  Further, the County provided Gilmore the opportunity to submit any documentation regarding his condition.  ECF No. 47 at 3 ¶ 8.

Accordingly, the Court grants summary judgment to the County on this interference claim.  *See McManus v. Saint Mary's Coll.*, 611 F. Supp. 3d 586 (N.D. Ind. 2020) (finding that a 30-60 minute meeting to discuss a plaintiff's return to work was *de minimis* and that "[t]he meeting was as much for [the plaintiff's] benefit to facilitate her return to work under the restrictions imposed by her physician.").

*3.  Denial of Benefits – Attempting to Get Plaintiff to Waive FMLA Rights*

The County asserts that the fact Gilmore attended a remote, work-related meeting approximately ten days before the scheduled interactive meeting supports

ORDER - 38

that it was feasible for Gilmore to attend the interactive meeting via Webex and that attending would not have interfered with his ability to care for his wife.  ECF No. 46 at 2-3.  Gilmore asserts that an employee cannot waive his FMLA rights, but that the County attempted to induce him to do so.  ECF No. 38 at 11.

Gilmore relies on the first sentence of 29 C.F.R. § 825.220(d), which states in full:

> *Employees cannot waive, nor may employers induce employees to waive, their prospective rights under FMLA.* For example, employees (or their collective bargaining representatives) cannot trade off the right to take FMLA leave against some other benefit offered by the employer. This does not prevent the settlement or release of FMLA claims by employees based on past employer conduct without the approval of the Department of Labor or a court.  Nor does it prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a light duty assignment while recovering from a serious health condition.  See § 825.702(d).  An employee's acceptance of such light duty assignment does not constitute a waiver of the employee's prospective rights, including the right to be restored to the same position the employee held at the time the employee's FMLA leave commenced or to an equivalent position. The employee's right to restoration, however, ceases at the end of the applicable 12–month FMLA leave year.

The Ninth Circuit has clarified that "waiver in the context of the FMLA means that an employee cannot trade off the right to take FMLA leave against some other benefit offered by the employer as part of a collective bargaining agreement or some other form of negotiation." *Escriba v. Foster*

ORDER - 39

*Poultry Farms, Inc.*, 743 F.3d 1236, 1244 (9th Cir. 2014) (quotation marks omitted) (citing 29 C.F.R. § 825.220(d)).  Gilmore has not alleged, or presented evidence, that he traded his right to take FMLA leave for some other benefit.

### 4.  Denial of Benefits - Termination

The parties dispute whether Gilmore's exercise of his FMLA rights was a negative factor in the County's employment decision.

"An employer violates the FMLA's anti-interference provision if it 'use[s] the taking of FMLA leave as a negative factor in employment actions.'"  *Allstot*, 2018 WL 3966255 (quoting *Bachelder*, 259 F.3d at 1122-24).  Gilmore has presented no evidence to suggest that his taking FMLA leave was a factor in his termination.  Rather, the evidence before the Court is that on March 20, 2024, Chief Guerrero informed Gilmore that the County was considering medically separating him.  *See* ECF No. 61 at 4.  The County initially scheduled an interactive meeting for April 18, 2024, but rescheduled this meeting when Gilmore subsequently went on FMLA leave.  The County declined to reschedule the meeting a second time and offered Gilmore alternatives to participate in the meeting.  Chief Guerrero also warned Gilmore that while his "attendance [was] voluntary," if he did not participate, the County would "move forward and make such decisions regarding [his] employment status based on information currently in [their] possession.  ECF No. 61 at 4 (quoting ECF No. 34-13 at 2).  Gilmore

ORDER - 40

nonetheless chose not to attend or provide any information that the County could use in making its decision.  Gilmore now asserts that his healthcare providers subsequently released him from all workplace restrictions and that if the County had "waited to hold the interactive meeting until after Gilmore returned from FMLA leave on June 18, 2024, [he] would not have been medically separated." ECF No. 38 at 16.  Yet Gilmore did not provide the County with any information regarding his alleged improvement despite knowing that it would be making a decision after the interactive meeting.

In sum, Gilmore's argument boils down to the fact that County should have waited to hold the interactive meeting until after his FMLA leave and that if it had done so, he would not have been medically separated.  However, viewing the facts in the light most favorable to the nonmoving party, there is no evidence, direct or circumstantial, before the Court that Gilmore taking FMLA leave was a factor in his termination.  The evidence before the Court demonstrates that his termination was based on his ongoing ADA accommodation and the information the County had at the time, which did not include any updates from Gilmore.  *See Yates v. Nw. Barricade & Signs*, 2024 WL 4710746, at *5 (W.D. Wash. Nov. 7, 2024) ("[The plaintiff] cites no evidence, direct or circumstantial, to suggest that her leave was a factor in her termination, however.  She appears to rely solely on the temporal proximity of her leave to her termination, but this alone does not suggest causation,

ORDER - 41

particularly in light of the Defendants' evidence suggesting a number of reasons unrelated to [the plaintiff's] use of leave to explain why Defendants terminated multiple employees including [the plaintiff]."); *Reif v. Shamrock Foods Co.*, 727 F. App'x 302, 303 (9th Cir. 2018) ("While there is a temporal relationship between [the plaintiff's] termination and his claim for FMLA-protected leave, [the defendant] made the decision to terminate [the plaintiff] before [he] invoked his FMLA rights.  Therefore, [the defendant's] decision to terminate could not have been influenced by [the plaintiff's] FMLA request, and [the plaintiff] has failed to raise a genuine issue of material fact on these claims.").

As Gilmore has raised no genuine issue of material fact that his taking FMLA leave to care for his wife was a factor in the County's decision to medically separate Gilmore, the Court grants summary judgment to the County on this interference claim.

Accordingly, **IT IS HEREBY ORDERED:**

1.    Defendant's Motion for Summary Judgment, **ECF No. 33**, is **GRANTED**.

2.    Plaintiff's Motion for Partial Summary Judgment, **ECF No. 38,** is **DENIED**.

ORDER - 42

**IT IS SO ORDERED.**  The District Court Executive is directed to (1) enter this Order; (2) provide copies to the parties; **(3) enter Judgment for Defendant on all claims; and (4). CLOSE the file.**

DATED June 25, 2026.


*s/Mary K. Dimke*
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE

ORDER - 43